[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11499
_____

D.C. Docket No. 6:12-cv-01560-RBD-GJK

WINNIFRED BELL,
et. al,

                                                    Plaintiffs - Appellants,

versus

CITY OF WINTER PARK, FLORIDA,
et. al,

                                                    Defendants - Appellees.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 20, 2014)

Before TJOFLAT, FAY and ALARCÓN,* Circuit Judges.


TJOFLAT, Circuit Judge:

_____

    * Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

Winnifred Bell, Allura Lightfoot, and Deanna Waller (collectively, the "Plaintiffs") challenge the City of Winter Park's Ordinance No. 2886-12, which generally prohibits targeted picketing within 50 feet of a residential dwelling, as an unconstitutional infringement on their First Amendment right to freedom of speech. The City moved to dismiss the Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6). The District Court, after considering the parties' memoranda in support of and against the City's motion, granted the motion and dismissed the case. The Plaintiffs now appeal.[1] For the reasons outlined below, we affirm in part and reverse in part.

I.

The City of Winter Park adopted Ordinance No. 2886-12 on September 24, 2012,[2] after finding that "there has occurred in the City of Winter Park a documented series of protest or picketing activity specifically targeted against an individual residing in a single family home . . . [and] this individual has feared for her safety as a result of this picketing activity," and that "there have been reported

---

[1] Because we are reviewing the District Court's grant of the City's motion to dismiss for failure to state a claim upon which relief can be granted, we exercise de novo review. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199 (11th Cir. 2007).

[2] In their verified complaint, the Plaintiffs attached a copy of an emergency ordinance the City passed prior to Ordinance No. 2886-12. The emergency ordinance was temporary and would expire 60 days after its passage unless the City adopted a permanent ordinance. Ordinance No. 2886-12 is that permanent ordinance and it is virtually identical in all relevant respects to the emergency ordinance. We therefore refer to the permanent ordinance, which was submitted as Doc. 16, despite the fact that it was not attached to the Plaintiffs' complaint.

instances during the last several years in which the domestic tranquility has been disturbed in residential areas by organized picketing and protest in residential areas directed against specific targeted residents living in those areas." Record, Doc. 16, at 8. The Ordinance contained seven sections, two of which are relevant in this case. Section 2 created a new § 62-79 of the Municipal Code of the City of Winter Park, which states:

> It shall be unlawful for any person or persons to picket, protest or conduct any picketing or protesting activity within a buffer area of 50 feet from the property line of any dwelling unit in the City of Winter Park. It shall also be unlawful for any person or persons to picket, protest or conduct any picketing or protesting activity in any park, public street, public right-of-way, or on a sidewalk, where such activity impedes or interferes with the rights of others to travel on or in such areas in a safe manner, consistent with the traditional pedestrian, bicycle or motor vehicle use of such areas.

Record, Doc. 16, at 12.[3] Section 3 of the Ordinance amended § 62-77 of the Municipal Code to add a new provision, which reads:

---

[3] The Ordinance defines "picket," "picketing," or "protest" to mean

any assembly of one or more persons, who, through conduct, speech or other form of expression, criticize, protest or complain about any matter in which a particular person, group of persons or type of person is specifically targeted for protest, complaint or criticism, and where such assembly stands, loiters, congregates or mills before or about a dwelling unit in which a person who is a target or subject of such protest resides or is perceived to reside.

One or more persons may be considered picketing or protesting within the meaning of this Section even if the message being communicated is intended to be heard or seen by persons in addition to the resident or residents inside a dwelling unit.

The Ordinance defines "dwelling unit," in relevant part, as

3

> A person regularly residing in a 'dwelling unit', as that term is defined in Section 62-79, may post a 'no loitering' sign on the property of such residence in which the person regularly resides, and an officer of the City may enforce this section against any person remaining in a public area, including a park, sidewalk, street, public right-of-way, after the sign is posted, who loiters, stands, sits, or lies before or about the dwelling unit on which property the 'no loitering' sign is posted, or remains on public property within a buffer area as defined in Section 62-79, of fifty (50) feet from the property line of such residence.

Record, Doc. 16, at 13. The City adopted the Ordinance by a 4–1 vote, with the four City Commissioners voting in favor and the Mayor of the City voting against. The Ordinance became effective immediately.

On October 16, 2012, the Plaintiffs filed a verified complaint, alleging that §§ 62-77 and 62-69 unconstitutionally abridge their freedom of speech.[4] The Plaintiffs sought a temporary restraining order, a preliminary injunction, and a permanent injunction restraining the City from enforcing the challenged provisions of the Municipal Code; a declaration that the challenged portions of the Municipal

---

> a building or portion thereof that is designed for residential occupancy, and shall include single family homes, zero lot line residences, townhomes or connected homes, and duplexes, and other single and multi-family dwelling units located in [particular zoning districts]. Where a single family residence is grandfathered in another zoning district and is still used for single family residential purposes it shall be included in this definition. Excluded from this definition are apartment buildings and condominiums located in a commercial zoning district

Record, Doc. 16, at 11–12.

[4] The Plaintiffs also raised a Free Exercise claim under the First Amendment and an Equal Protection claim under the Fourteenth Amendment. Those claims were also dismissed, but the Plaintiffs do not challenge their dismissal on appeal.

Code constitute an impermissible restraint of their speech rights; damages; and attorney's fees. The District Court converted the Plaintiffs' application for a temporary restraining order to one seeking a preliminary injunction and took the matter under advisement.

The City filed a motion to dismiss the verified complaint and a memorandum of law in support of its motion on November 14, 2012. The City argued that the Ordinance is facially constitutional because it is a permissible content-neutral regulation of speech. On March 7, 2013, the District Court granted the City's motion to dismiss, finding that the Ordinance is content-neutral, serves a significant government interest, and is narrowly tailored to achieving those ends. This appeal followed.

## II.

The First Amendment provides, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[5] Despite the seemingly clear imperative of the text of the First Amendment, the Supreme Court has held that a content-neutral restriction of speech[6] is constitutional if it "serves a significant

---

[5] The First Amendment is made applicable against the states through the Fourteenth Amendment's due process clause. Schneider v. State, 308 U.S. 147, 160, 60 S. Ct. 146, 150, 84 L. Ed. 155 (1939); see also Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940).

[6] Our principal inquiry in determining whether a restriction on speech is content-neutral is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration." Ward v. Rock

5

government interest," is "is narrowly tailored" to achieving those ends, and leaves ample alternative avenues for speech. Frisby v. Schultz, 487 U.S. 474, 484–85, 108 S. Ct. 2495, 2502–03, 101 L. Ed. 2d 420 (1988).[7]

In Frisby, the Supreme Court upheld a municipal ordinance that prohibited "focused picketing taking place solely in front of a particular residence." Id. at 483, 108 S. Ct. at 2502. The Court recognized that the government has a significant interest in "protecting the well-being, tranquility, and privacy of the home," id. at 484, 108 S. Ct. at 2502 (quoting Carey v. Brown, 447 U.S. 455, 471, 100 S. Ct. 2286, 2296, 65 L. Ed. 2d 263 (1980)), and in protecting the unwilling listener, id. ("Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different." (citations omitted)). The ordinance at issue was deemed narrowly tailored because "[t]he type of picketers banned by the . . . ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way." Id. at 486, 108 S. Ct. at 2503. Finally, the ordinance left open ample alternative channels for speech because protestors remained free to

Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754, 105 L. Ed. 2d 661 (1989) (citation omitted).

[7] This is not the same test that applies to content-based restrictions on speech. See CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1280 (11th Cir. 2006) ("If the regulation is content-based, it is subject to strict scrutiny; if the regulation is content-neutral, it is subject to intermediate scrutiny.").

march through residential areas, to go door-to-door proselytizing their views, and to distribute literature. Id. at 484, 108 S. Ct. at 2502. Because the ordinance withstood intermediate scrutiny, the Supreme Court held the ordinance was not facially unconstitutional. Id. at 488, 108 S. Ct. at 2504.

Section 62-79 is nearly on all fours with Frisby, and we thus hold that the it is similarly facially constitutional. Section 62-79 does not regulate speech on the basis of the content or viewpoint of the speech. Rather, it regulates the time, place, and manner in which Plaintiffs can speak. The City did not adopt § 62-79 because of any disagreement with any speech's message. It adopted the Ordinance with a stated purpose of safeguarding "the harmony, peace and tranquility of persons residing in residential dwelling units" by ensuring that "they feel free in their own homes, and safe from protests and picketing activity that targets them or that is directed at them." Record, Doc. 16, at 12.

Although the Ordinance defines "picketing" to mean criticism, protest, or complaint, those words describe picketing generally. See, e.g., Black's Law Dictionary 1264 (9th ed. 2009) (defining "picketing" as "[t]he demonstration by one or more persons outside a business or organization to protest the entity's activities or policies"); Webster's New World Dictionary 1021 (3d College ed. 1988) (defining "picket" as "a person, as a member of a labor union on strike, stationed outside a factory, store, or public building, often carrying a sign, to

7

demonstrate opposition to certain views or practices"). In other words, the common use of the term picket denotes criticism; one does not usually picket in favor of or in support of something. Section 62-79 is content neutral.

Having determined that § 62-79 is content-neutral, we consider whether it withstands intermediate scrutiny. We readily conclude that it does. Section 62-79 serves the same governmental interests the Supreme Court approved of in Frisby. Moreover, § 62-79 is narrowly tailored to achieve those ends. Like the ordinance in Frisby, "[t]he type of picketers banned by the [Winter Park] ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way." See Frisby, 487 U.S. at 486, 108 S. Ct. at 2503. And, as the Supreme Court noted, "even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy." Id. Finally, § 62-79 leaves open alternative channels of speech. Like the protestors in Frisby, the Plaintiffs remain free to march, to proselytize, and to distribute literature within 50 feet of the dwelling unit. They can even picket. If their picketing does not target a particular person, group of persons, or type of person who resides in the dwelling unit, they can continue to engage in general picketing within the buffer area. Moreover, so long as the Plaintiffs remain 51 feet away from a dwelling unit, they

8

remain at liberty to engage in targeted picketing.[8]  Section 62-79 goes further than the one in Frisby, as the Winter Park City Manager is required, on application, to make City-owned land reasonably near or abutting a residential area available for protest or picketing.  The District Court's dismissal of Plaintiffs' challenge to § 62-79 was proper.

## III.

Although we believe § 62-79 is facially constitutional, we harbor serious concerns as to the constitutionality of the loitering provision of the Ordinance, § 62-77.[9]  Section 62-77 permits private citizens to post no loitering signs on their

---

[8] In the District Court, the Plaintiffs argued that the Ordinance's 50-foot buffer area is constitutionally suspect.  The District Court, it its order dismissing the verified complaint, disagreed, noting:

> Plaintiffs' counsel argued at the hearing that eliminating the buffer zone would make the ordinance more narrowly tailored and bring it in line with Frisby.  Plaintiffs also contend that the ordinance is vague for similar reasons. The Court cannot agree.  Eliminating the buffer zone would be more restrictive and more confusing to the protesters, not less.  The way the ordinance is drafted, picketers know exactly how close they can get to the targeted residence, unlike in Frisby, where the ban was simply on picketing "before or about" a residence.  The fact that this ordinance creates a specific, quantifiable buffer zone makes an even stronger case for its constitutionality than the ordinance approved in Frisby.

Record, Doc. 41, at 13 n.13 (citations omitted).  On appeal, the Plaintiffs write that "[b]ecause the trial court applied a limiting interpretation that removed the buffer zone, Plaintiffs do not raise the issue in this appeal."  Appellants' Br. at 34.  However, the District Court's order did no such thing.  The court did not apply any sort of limiting principle, nor did it sever the buffer area provision of the Ordinance.  Nevertheless, by not raising the issue on appeal, the Plaintiffs have abandoned any argument that the 50-foot buffer area renders the Ordinance unconstitutional.  See United States v. Ford, 270 F.3d 1346, 1347 (11th Cir. 2001) ("[O]ur well established rule is that issues and contentions not timely raised in the briefs are deemed abandoned.").

[9] On appeal, the Plaintiffs argue that the District Court did not address the constitutionality of § 62-77 and that we therefore ought to remand the case to the District Court

property to prevent others from loitering, standing, sitting, or lying before or about the dwelling unit on which the sign is posted.  Like a no trespassing ordinance, § 62-77 permits a private citizen to prevent others from congregating on the property.  And if that were all § 62-77 did, we likely would find no First Amendment problem.  Cf. Frisby, 487 U.S. at 485, 108 S. Ct. at 2502 ("[I]ndividuals are not required to welcome unwanted speech into their own homes and . . . the government may protect this freedom.").

However, § 62-77 goes beyond simply allowing a private citizen to control the speech he allows on his property; the section permits private residents to control the speech of others within a 50-foot buffer area of the citizen's property. The Ordinance makes clear that the buffer area includes "any park, public street, public right-of-way, or sidewalk, located within an area that extends fifty (50) linear feet in any direction measured from the property line of a dwelling unit." Record, Doc. 16, at 12.  And § 62-77 expressly permits Winter Park police officers

for consideration of the matter.  We do not agree.  The City moved to dismiss the verified complaint in its entirety, and the District Court dismissed the verified complaint in its entirety. Although it is true that City did not advance a specific argument on the constitutionality of § 62-77 in its memorandum supporting its motion to dismiss, it made clear that it believed the Ordinance, as a whole, was constitutional.  We exercise de novo review of a District Court's granting of a motion to dismiss, Griffin Indus., Inc., 496 F.3d at 1199, therefore we are conducting an independent review of whether the Plaintiffs' verified complaint states a claim on which relief can be granted.  That the District Court's order did not specifically analyze the constitutionality of § 62-77 does not thwart our review of that Section on appeal.

10

to enforce the loitering provision against any person "remaining in a public area, including a park, sidewalk, street, [or] public right-of way, after the sign is posted." Record, Doc. 16, at 13.  In other words, private citizens can decide that they dislike the content or viewpoint of a speaker's message and then contact the Winter Park police to enforce § 62-77.

To be sure, the loitering provision appears to be content neutral; it prohibits loitering generally and does not target any particular form of speech or conduct. However, § 62-77 grants virtually unfettered discretion in how it is enforced.  That is, the Ordinance allows private citizens to prohibit speech in traditional public fora[10] for any reason, including content- and viewpoint-based reasons.  This strikes us as unprecedented.[11]  "A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional," Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 322 F.3d 1298, 1310 (11th Cir. 2003) (en banc), and we see little reason to believe that a similar grant of unrestrained discretion to private citizens to summon the police to prohibit First Amendment activities in public fora fares any better.  Section 62-77 permits private citizens to control the speech of other private

---

[10] See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469, 129 S. Ct. 1125, 1132, 172 L. Ed. 2d 853 (2009) (describing public streets and parks as traditional public fora).

[11] When asked at argument whether the City could cite any case in which private citizens were permitted to silence the speech of others in a traditional public fora, counsel for the City stated he could not.

11

citizens by calling the police.  Cf. Shelley v. Kraemer, 334 U.S. 1, 20, 68 S. Ct. 836, 845, 92 L. Ed. 1161 (1948) (invalidating private racially restrictive covenants because the covenants were enforced by the state, which created state action sufficient to deny the "equal protection of the laws" guaranteed by that Amendment).[12]

Moreover, § 62-77 states that "an officer of the City may enforce [the loitering provision] against any person remaining in a public area . . . after the sign is posted."  Record, Doc. 16, at 13 (emphasis added).  No definition is provided for the term remain, and the common definition—"to stay in the same place," Webster's New World Dictionary 1134 (3d College ed. 1988)—provides a citizen with immense discretion to use the police to enforce the loitering provision and thus creates a risk of targeted enforcement based on the content or viewpoint of an individual's speech.  How long must one stay in the same place to violate § 62-77?  Five minutes?  One minute?  Citizens are left to wonder.

> A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.  The lack of objective criteria in the governmental exemption readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, [and] results in a

---

[12] A person who violates § 62-77 is subject to a $60 civil penalty, a fine not to exceed $500, or imprisonment not to exceed 60 days.

continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview.

CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1279 (11th Cir. 2006) (internal quotation marks and citations omitted).

The amount of discretion § 62-77 provides is alarming. Private citizens are permitted to have the City regulate speech on traditional public fora for any reason. Additionally, § 62-77 provides no standards for enforcement, leaving City officers free to enforce the prohibition on the basis of the content or viewpoint of an individual's speech. We therefore hold that § 62-77 is unconstitutional.

## IV.

The Ordinance's ban on targeted picketing, § 62-79 is content-neutral, furthers a significant government interest, is narrowly tailored, and leaves open ample alternative channels for speech. It is, therefore, facially constitutional, and the District Court properly dismissed the Plaintiff's challenge as to § 62-79.[13] However, § 62-77 grants private citizens unbridled discretion to invoke the City's power to regulate speech in public fora abutting private residences. We conclude that the loitering provision is facially unconstitutional and invalid. The District Court's judgment is, accordingly,

AFFIRMED in part and REVERSED in part.

---

[13] In light of the fact that the dismissal of the Plaintiffs' challenge to § 62-79 was proper, we also affirm the District Court's denial of a preliminary injunction as to that section.

13